**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AL F. BARNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  15-CV-850 |
| v. | ) | |
| | ) | Judge Amy J. St. Eve |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Al F. Barner ("Mr. Barner") brings this action pursuant to 42 U.S.C. §405(g) seeking judicial review of the Acting Commissioner of the Social Security Administration's ("Commissioner") final agency decision denying his application for Title II Disability Insurance Benefits ("DIB") pursuant to the Social Security Act, 42 U.S.C. §§416(i), 423(d).  Before the Court is Mr. Barner's motion for summary judgment asking the Court to reverse and remand the Commissioner's decision for a new hearing.  For the following reasons, the Court denies Mr. Barner's motion.

### PROCEDURAL HISTORY

On December 29, 2011, Mr. Barner applied for DIB alleging that he became disabled beginning on November 15, 2011 after being shot in a drive-by shooting.  (R. 8, Admin. Record, at 12.)  The state disability determination service initially denied Mr. Barner's application on May 4, 2012 and, upon reconsideration, denied it again on September 10, 2012.  (*Id.*)  Subsequently, on October 1, 2012, Mr. Barner filed a written request for a hearing.  (*Id.*)  On July 25, 2013, Mr. Barner appeared and testified at a video hearing before Administrative Law

Judge Edward P. Studzinski ("ALJ").  (*Id*. at 12, 23.)  Mr. Barner appeared in Gary, Indiana

while the ALJ presided over the hearing from Valparaiso, Indiana.  (*Id*.)  An impartial vocational

expert, Ronald Malik, also appeared and testified at the July 2013 video hearing.  (*Id*.)  On

August 8, 2013, the ALJ issued a written decision concluding that Mr. Barner was not disabled

within the meaning of the Social Security Act.  (*Id*. at 12-23.)  Thereafter, on October 7, 2013,

Mr. Barner sought review of the ALJ's decision with the Social Security Administration's

Appeals Council.  (*Id*. at 8.)  On December 2, 2014, the Appeals Council denied Mr. Barner's

request for review.  (*Id*. at 1-6.)  Mr. Barner filed the present action for judicial review on

January 28, 2015.  (R. 1, Complaint.)

## FACTUAL BACKGROUND

### I.      Vocational Evidence

Mr. Barner was born on June 14, 1957 and was fifty-six years old when the ALJ released

his August 8, 2013 decision.  (R. 8, Admin. Record, at 169.)  He was approximately 5'5" tall and

weighed around 170 pounds.  (*Id*. at 40.)  In June 1976, Mr. Barner completed at least one year

of college.  (*Id*. at 190.)  Mr. Barner was once married, is currently separated, and has two

children, ages nineteen and twenty as of April 2012.  (*Id*. at 424.)  Beginning in 1996, Mr. Barner

worked full-time as a medical facility security officer for approximately sixteen years prior to the

ALJ's decision.  (*Id*. at 217, 218.)  Additionally, he worked five hours a day, five days a week as

a part-time home aid taking care of his elderly father for approximately thirteen years prior to the

ALJ's decision.  (*Id*. at 217, 219.)

### II.     Medical Evidence

Medical evidence in the record includes information regarding the shooting incident and

medical aftermath that triggered Mr. Barner's DIB requests at issue.  (*Id*. at 261-67.)  On

November 15, 2011, Mr. Barner was standing on his friend's porch when an unknown assailant drove by and shot him multiple times, striking Mr. Barner in the posterior chest, back, and left forearm and killing Mr. Barner's friend. (*Id*. at 262, 424.) After the unfortunate shooting, paramedics took Mr. Barner to Little Company of Mary Hospital. (*Id*. at 261.) X-ray examinations revealed a number of pellets from a shotgun injury to Mr. Barner's chest, abdomen, and forearm. (*Id*. at 265-67.) Mr. Barner's abdomen x-ray also revealed degenerative changes and dextroscoliosis of his lumbar spine. (*Id*. at 266.) Ultimately, Little Company of Mary Hospital determined Mr. Barner was in critical condition and transferred him to Mt. Sinai Hospital's trauma care. (*Id*. at 264.)

At Mt. Sinai, Mr. Barner's treating physician, Dr. Vincent Makhlouf, performed two surgeries on Mr. Barner within a week of the November 15, 2011 shooting. (*Id*. at 292-94, 296-97.) On both November 16 and November 21, 2011, Dr. Makhlouf operated on Mr. Barner's left forearm to relieve Mr. Barner of his compartment syndrome and repair the wound using a skin graft. (*Id*.) On November 28, 2011, Dr. Makhlouf scheduled Mr. Barner for eight weeks of outpatient occupational therapy. (*Id*. at 437-38.) Despite the occupational therapy, Mr. Barner continued to experience stiffness and flexion contractures in his left hand. (*Id*. at 306.) As a result, on February 1, 2012, Dr. Makhlouf performed a third surgery on Mr. Barner in which he conducted a flexor tenolysis, manipulating Mr. Barner's left fingers and joints. (*Id*.) On February 6, 2012, Dr. Makhlouf scheduled additional post-operative occupational therapy tailored toward Mr. Barner's left hand and issued Mr. Barner a CPM splint machine. (*Id*. at 360-61.) Mr. Barner began attending the additional occupational therapy on February 9, 2012. (*Id*. at 467.) Eventually, on March 5, 2012, Dr. Makhlouf issued a "no restrictions" order to Mr. Barner's occupational therapists. (*Id*. at 359.) Mr. Barner's occupational therapists interpreted

this note to mean that there were no restrictions regarding the therapy techniques they could implement for Mr. Barner's left arm. (*Id*. at 468.) On March 6, 2012, however, Mr. Barner lost his full-time security guard job and health insurance. (*Id*. at 467.) Subsequently, on March 7, 2012, Mr. Barner attended his last occupational therapy session, and the hospital halted all future sessions until Mr. Barner's insurance status changed. (*Id*.) At that time, Mr. Barner's occupational therapist determined that Mr. Barner had achieved two of his eight goals for his left hand. (*Id*. at 362.) During his last week of occupational therapy, however, Mr. Barner expressed to his therapists that he "should be fine," explaining that his extension was "really getting better" and that he was "able to pick up small objects." (*Id*. at 467-469.) Ultimately, Dr. Makhlouf released Mr. Barner to perform sedentary work beginning on May 21, 2012. (*Id*. at 496.)

The medical evidence in the record also includes information regarding Mr. Barner's clinical encounters with Dr. Urszula Jablonska on December 14, 2011, January 5, 2012, November 20, 2012, December 12, 2012, and March 6, 2013. (*Id*. at 331, 335, 476, 477, 481.) In her psychiatric examination, Dr. Jablonska consistently evaluated Mr. Barner as having "good judgment . . . normal mood and affect . . . [and being] active and alert . . . [and] orient[ed] to time, place, and person[.]" (*Id*. at 332, 335, 477, 481, 484.) Mr. Barner, however, alleged to Dr. Jablonska that he suffered from a number of issues including difficulty sleeping, fatigue, headaches, and reported depression. (*Id*. at 331, 335, 476, 477, 481.) Based on Mr. Barner's report, Dr. Jablonska determined Mr. Barner suffered from, in part, essential hypertension (unspecified), depressive disorder (not elsewhere classified), insomnia (unspecified), injuries related to a firearm, and injuries related to back pain. (*Id*. at 331, 334, 475-76, 480, 483.) Relatedly, the record medical evidence details Mr. Barner's Disability Determination Explanation reports that include his encounters with state agency psychological consultants, Drs.

David Gilliland and Lionel Hudspeth. (*Id*. at 84, 98.) Both doctors referenced Dr. Jablonska's "depressive" assessment and concluded that the "medical evidence [was] not indicative of a severe mental condition," referring to Mr. Barner's allegations as "credible and indicatve [sic] of no more than mild mental functioanal [sic] limitations." (*Id*.)

Other medical evidence in the record included a report from Mr. Barner's April 5, 2012 psychological consultation with Dr. Jeffrey Karr. (*Id*. at 424-27.) Dr. Karr reported that Mr. Barner's "[m]ood and affect were contruent [sic] without overt indication of dysphoria or anxiety . . . He was alert but not vigilant with no apparent cognitive difficulty. There was no indication of gross psychopathology." (*Id*. at 425.) In sum, Mr. Barner "presented unremarkably." (*Id*. at 427.) Dr. Karr reported, however, that, "in contrast to [this conclusion], [Mr. Barner] alleges residual emotional effects in connection with trauma." (*Id*.) Ultimately, Dr. Karr diagnosed Mr. Barner with "post-traumatic stress disorder, not otherwise specified." (*Id*. at 426.)

Finally, the record medical evidence included, in part, a detailed description of Mr. Barner's August 22, 2012 physical consultation and examination with Dr. Patil. Dr. Patil's report detailed Mr. Barner's chief complaints, current medications, social history, general appearance, and medical status, both physical and mental. (*Id*. at 463-66.) Specifically, in relevant part, Dr. Patil reported the following: Mr. Barner's gait was "normal"; he had "no swelling, tenderness, deformity, or hypernia of any joint"; he had "no paravertebral tenderness or spasm"; he had "full range of motion in all joints"; he exhibited only slight flexion limitation; his strength was five out of five in all extremities except the left upper extremity that was only slightly diminished, ranking four out of five; he showed no limitations when picking small objects up; and he only displayed mild limitations in his left upper extremity when opening a door or squeezing a bulb. (*Id*.)

### III.    Hearing Testimony

#### A.    Ms. Heather Garay's Opening Statement

Ms. Garay, Mr. Barner's counsel, gave an opening statement at the hearing.  (*Id*. at 32.)

Ms. Garay began her statement by describing Mr. Barner's gunshot injuries to his left arm and

hand, his multiple surgeries, his lasting impairment and pain, and his occupational therapy.  (*Id*.

at 32-33.)  In addition, Ms. Garay discussed Mr. Barner's ongoing lumbar degenerative disease,

multiple herniated discs, and stenosis exacerbated by the November 2011 shooting.  (*Id*. at 32.)

She also explained that Mr. Barner suffered from mental, as well as physical, impairments.  (*Id*.

at 33.)  Specifically, she described Mr. Barner's headaches, insomnia, and post-traumatic stress

disorder for which, she alleged, Mr. Barner was going to start treatment with a psychiatrist.  (*Id*.)

Given Mr. Barner's experiences and status, Ms. Garay explained, Mr. Barner's appropriate

residual functional capacity was a light exertion level with postural restrictions for his left upper

extremity.  (*Id*. at 34.)

#### B.    Mr. Al F. Barner's Testimony

Mr. Barner testified at the July 25, 2013 hearing that he lived in a townhouse with his

elderly father and son.  (*Id*. at 40.)  He further testified that he had received unemployment

benefits for at least five months ending in May or June 2012.  (*Id*. 41.)  In his applications for

such benefits, Mr. Barner stated that he listed himself as willing and able to work and looking for

work.  (*Id*.)  Specifically, Mr. Barner testified that he was looking for security jobs like those that

he held before the November 2011 shooting.  (*Id*. at 42.)  No one, according to Mr. Barner,

called him back.  (*Id*.)  As a result, Mr. Barner testified that he had no other sources of income

except for his long-term disability coverage.  (*Id*. at 40.)  Mr. Barner stated that his long-term

disability was $1,900.00 a month, was supposed to last for ten years, and helped him cover his $159.00 monthly insurance payments.  (*Id*. at 43.)

Next, Mr. Barner testified about the jobs he held at the time of the November 2011 shooting.  He testified that he was previously working as a part-time healthcare aid to his elderly father who suffered from prostate cancer and dementia.  (*Id*. at 44-45.)  Mr. Barner stated that he would often have to lift his father, who weighed approximately 170 pounds.  (*Id*. at 45.)  After missing twelve weeks from this position as a result of his shooting injury and surgeries, the healthcare facility terminated Mr. Barner and replaced him with his son.  (*Id*.)  Mr. Barner also testified that he was working as a full-time hospital security guard during the November 2011 shooting.  (*Id*.)  Specifically, Mr. Barner was a supervisor and guard who spent all eight hours of every shift on his feet.  (*Id*. at 46-47.)  Mr. Barner asserted that he would often have to lift up to 200 pounds on his own as part of his responsibilities.  (*Id*. at 47.)  As a result, Mr. Barner testified, his security officer employer rejected his attempt to return after his surgeries, because Mr. Barner could not lift any more than twenty pounds.  (*Id*. at 42.)

Further, Mr. Barner testified about his current physical status and how it related to his failed attempts to return to work.  (*Id*. at 52.)  Mr. Barner explained that he could not return to these past jobs, in part, because of the pain in his left arm, the discomfort in his back when he stands or sits for too long, and the medicine he was taking.  (*Id*.)  Specifically, Mr. Barner testified that he could sit for approximately thirty to forty minutes at most before needing to stand or walk around to relieve his pain for ten minutes.  (*Id*. at 52-53.)  He also stated that he could likely stand for twenty minutes before needing to sit or walk and could walk for up to three blocks before feeling discomfort.  (*Id*. at 54.)  Additionally, Mr. Barner noted that he could likely lift up to twenty-five pounds with his right hand, fifteen pounds with his left, injured hand, and

fifteen pounds with both hands. (*Id*. at 54-56.) He explained that he also experiences manipulation limitations with his left hand. (*Id*. at 58.) Specifically, he has difficulty holding small items, such as utensils and mugs, making a fist, and extending his arm away from his body. (*Id*. at 58-59.) Despite medication, Mr. Barner stated, he constantly experiences level nine pain in his left arm and hand and level seven pain in his lower back and thigh on a ten-point pain scale with ten being the worst pain. (*Id*. at 59-60.) He alleged that his pain medication often makes him a little dizzy and gives him headaches, keeping him indoors. (*Id*. at 61.) Mr. Barner also testified that his right arm and hand is fully functional. (*Id*. at 60.)

Finally, Mr. Barner testified about his indoor and outdoor activities and his mental status. (*Id*. at 62-66.) He stated that he does very limited driving, going to the store three to four times a month and taking his elderly father to his hospital appointments. (*Id*. at 62.) These trips can include up to twenty minutes of driving at one time. (*Id*. at 63.) Mr. Barner testified that he does almost no household chores like he did before the shooting injury. (*Id*.) He also explained that he does not participate in any social activities outside of the house. (*Id*. at 64.) Finally, Mr. Barner testified that he was having difficulty sleeping, suffering from nightmares and flashbacks about the shooting, and crying a lot. (*Id*.) He then revealed that he was going to try and receive some kind of counseling from a psychiatrist regarding these issues, but he had not yet done so. (*Id*.)

### C.    Mr. Ronald Malik's Testimony

Mr. Ronald Malik, a vocational expert, also testified at the July 25, 2013 hearing. Mr. Malik testified about the exertion and skill levels involved in Mr. Barner's relevant previous jobs using the Dictionary of Occupational Titles ("DOT"). (*Id*. at 67.) First, Mr. Malik testified, in part, that Mr. Barner's home health care job was a semiskilled position that required medium

level physical demand per the DOT and heavy to very heavy levels per Mr. Barner's subjective description. (*Id*. at 67-68.) Second, he testified that Mr. Barner's security officer job was a semiskilled position with light physical demand per the DOT and medium levels per Mr. Barner's description. (*Id*. at 68.) Finally, Mr. Malik testified that Mr. Barner's security supervisor job was a skilled position with light physical demand per the DOT and medium to heavy levels per Mr. Barner's description. (*Id*.)

Next, the ALJ posed a number of hypothetical questions to Mr. Malik. In relevant part, the ALJ asked Mr. Malik to imagine the following individual: one who is limited to light level work; can lift twenty pounds maximum; can stand, walk, or sit for no more than sixty minutes at any one time with five minute opportunities to change positions without abandoning work stations; and cannot climb ladders, ropes, or scaffolds. (*Id*. at 68-69.) Further, the ALJ asked Mr. Malik whether this individual would be able to perform any of the past jobs Mr. Barner performed before the November 2011 shooting. (*Id*.) At first, Mr. Malik answered no because he thought the ALJ hypothesized that the individual could only stand for fifteen minutes at a time. (*Id*. 69-70.) The ALJ corrected Mr. Malik and stated that the hypothetical individual could stand for sixty minutes and would be able to assume different positions for five minutes of every hour. (*Id*. at 70.) Given this clarification, Mr. Malik testified that Mr. Barner would be able to perform the security guard job according to the DOT, but not per Mr. Barner's description. (*Id*.) Specifically, Mr. Malik explained that the hypothetical individual would be able to perform the work as defined in the DOT especially if his dominant right arm and hand were fully functional like Mr. Barner's. (*Id*. at 71.) Mr. Malik further testified that this hypothetical individual would be able to perform the previous job without any difficulty even if the individual had to change positions at the light level after every thirty minutes. (*Id*. at 73.)

Finally, Mr. Malik testified about relevant employment concerns regarding narcotic pain medication.  (*Id*. at 74.)  Specifically, he explained that a narcotic pain medication's effect on one's employment status depends on the employer.  (*Id*.)  Mr. Malik also testified that taking these medications may erode the job market for the patient, but he admitted that he had not conducted a labor market survey to that effect.  (*Id*.)

**ALJ's DECISION**

The ALJ evaluated Mr. Barner's application under the five-step sequential analysis.  At step one, the ALJ found that Mr. Barner met the insured status requirements of the Social Security Act through December 31, 2016 and had not engaged in substantial gainful activity since November 15, 2011, the alleged disability onset date.  (*Id*. at 14.)  At step two, the ALJ found that Mr. Barner suffered from the following severe impairments: 1) the late effects of a gunshot wound to the left upper extremity and back and 2) lumbar degenerative disc disease. (*Id*.)  At step three, the ALJ determined that Mr. Barner did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*. at 15.)  The ALJ then went on to step four and considered Mr. Barner's residual functional capacity, concluding that Mr. Barner could perform basic work-related activities at the light physical demand level.  (*Id*. at 16.)  Specifically, the ALJ concluded that Mr. Barner could lift twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for up to six hours in an eight hour work period if given the opportunity to alternate to another position for five minutes; and frequently perform fine and gross manipulative actions with his left non-dominant upper extremity.  (*Id*.)  The ALJ, however, limited Mr. Barner's residual functional capacity by finding that Mr. Barner could never climb ladders, ropes, or scaffolds; only frequently stoop, kneel, crouch, or crawl; and never perform

forceful grasping or torqueing with his left, non-dominant upper extremity.  (*Id*.)  Continuing

step four, the ALJ determined that Mr. Barner was capable of performing past relevant work as

both a security guard and security manager as defined by the DOT.  (*Id*. at 22.)  The ALJ

explained that this work did not require the performance of work-related activities precluded by

Mr. Barner's residual functional capacity.  (*Id*.)  Thus, the ALJ concluded, Mr. Barner had not

been under a disability, as defined in the Social Security Act, from the November 15, 2011 onset

date through the July 25, 2013 decision date.  (*Id*.)

## LEGAL STANDARDS

### I.    Standard of Review

"If the appeals Council denies a request for review, . . . the ALJ's decision becomes the

final decision of the Commissioner of Social Security."  *Nelms v. Astrue*, 553 F.3d 1093, 1097

(7th Cir. 2009) (citation omitted).  A reviewing court's role in reviewing an ALJ's decision is "

'extremely limited[.]' "  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Elder v.

Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

"We reverse the Commissioner's final decision only if it is not supported by substantial

evidence or is based on legal error."  *Hopgood ex re. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir.

2009); *see also Golembiewski v. Barnhart,* 322 F.3d 912, 915 (7th Cir. 2003) (noting that "[t]his

is a deferential but not entirely uncritical standard").  "Substantial evidence is 'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.' "  *Beardsley v.

Colvin*, 758 F.3d 834, 836 (7th Cir. 2014) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91

S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *see also Dornseif v. Astrue*, 11 C 4335, 2012 WL

1441770, at *7 (N.D. Ill. April 26, 2012).  Accordingly, "even if reasonable minds could differ

concerning whether [one] is disabled, [a reviewing court will] affirm if the ALJ's decision has

adequate support." *Simila,* 573 F.3d at 513 (internal quotation omitted). Furthermore, the ALJ "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citations omitted). "[I]f the decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood,* 578 F.3d at 698 (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

"While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record." *Nelms,* 553 F.3d at 1098. " 'An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernible.' " *Simila,* 573 F.3d at 516 (quoting *Barnett v. Barnhart,* 381 F.3d 664, 669 (7th Cir. 2004)). An ALJ is not required, however, to discuss or mention every strand of evidence. *See Simila,* 573 F.3d at 516-17. "An ALJ is entitled to evaluate the evidence and explanations that support a medical source's findings," and "[he] need not recontact the source every time [he] undertakes such an evaluation." *Id.* at 517. A reviewing court "generally upholds the reasoned judgment of the Commissioner on how much evidence to gather." *Nelms,* 553 F.3d at 1098.

## II.    Disability Standard

A person is disabled for purposes of DIB if there is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also Weatherbee v. Astrue,* 649 F.3d 565, 568 (7th Cir. 2011). Also, to qualify for DIB "a claimant must show that the disability arose while he or she was insured for benefits." *Liskowitz v.*

*Astrue*, 559 F.3d 736, 740 (7th Cir. 2009); *see also Allord v. Astrue*, 631 F.3d 411, 416 (7th Cir. 2011).

In determining whether a claimant is disabled under Section 423(d)(1)(A), the Commissioner created a five-step, sequential analysis under 20 C.F.R. § 404.1520(a)(4)(i)-(v). *See Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010); *see also Larson v. Astrue,* 615 F.3d 744, 748 (7th Cir. 2010). Under this five-step analysis, a claimant must show that: (1) she is not presently engaged in substantial gainful activity; (2) her impairment is severe; and (3) her impairment meets or is equal to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). If the impairment meets or equals one of the listed impairments in step three, the claimant qualifies for disability benefits, and the ALJ need not make any further inquiries. *See Craft v. Astrue,* 539 F.3d 668, 674 (7th Cir. 2008). If the claimant does not qualify for benefits under step three, however, the ALJ's analysis proceeds to step four, which requires an assessment of whether the claimant has insufficient residual functional capacity ("RFC") to perform his past relevant work. *See Simila*, 573 F.3d at 513. If the impairment precludes performance of past work, step five calls for the ALJ to consider the claimant's age, education, past relevant work experience, and RFC to determine if other work exists in significant quantity in the national economy that would accommodate the claimant. *See Craft,* 539 F.3d at 674. The claimant bears the burden of proof through step four of this sequential analysis. *See Weatherbee,* 649 F.3d at 569. At step five, the burden shifts to the Commissioner to establish that the claimant can successfully perform a significant number of jobs existing in the national economy. *See id.*

**ANALYSIS**

In his summary judgment motion, Mr. Barner argues that: 1) the ALJ failed to consider Mr. Barner's nongovernmental long-term disability benefits; 2) the ALJ failed to consider Mr. Barner's mental impairments; 3) the ALJ inappropriately ignored a treating physician's opinion; and 4) the ALJ committed a number of errors in his step four analysis regarding the vocational expert's testimony. The Court addresses each argument in turn.

**I.      Nongovernmental Disability Benefits**

Mr. Barner first argues that the ALJ failed to adequately consider Mr. Barner's nongovernmental long-term disability benefits. "Determinations of disability by other agencies," however, "do not bind the Social Security Administration[.]" *Allord v. Barnhart*, 455 F.3d 818, 820 (7th Cir. 2006) (citing 20 C.F.R. §416.904); *see also Gee v. Celebrezze*, 355 F.2d 849, 850 (7th Cir. 1966) ("The Secretary is not bound by determinations of other agencies possibly made on standards different from those to which [the claimant] is subject."). Instead, the ALJ must simply give "some weight" to external determinations. *Allord*, 455 F.3d at 820 (citing *Danel v. Sullivan*, 902 F.2d 559, 660-61 n. 1 (7th Cir. 1990)); *see also Smith v. Secretary of Health, Ed. and Welfare*, 587 F.2d 857, 861 (7th Cir. 1978).

Here, the Court is not persuaded by Mr. Barner's contention that the ALJ failed to adequately consider his nongovernmental disability benefits. In fact, the ALJ explicitly acknowledged that Mr. Barner testified that he received long-term disability benefits that provided him $1,900 a month. (R. 8, Admin. Record, at 18.) Afterward, however, the ALJ highlighted evidence in the administrative record that was inconsistent with Mr. Barner's testimony, reducing the external benefits' weight in determining whether Mr. Barner was disabled. Specifically, the ALJ noted that Mr. Barner reported that he should be fine and was

able to pick up small objects with his upper left extremity during his last week of therapy sessions between February 29 and March 7, 2012. (*Id.*; *see also id.* at 467-469.) The ALJ also explained that Mr. Barner's hearing testimony, claiming he experienced level nine pain, was inconsistent with the therapist's report in which Mr. Barner reported that he experienced no pain while resting and level four maximum pain with work. (*Id.*; *see also id.* at 348-49.) Moreover, the ALJ found that Mr. Barner never sought additional care upon regaining health insurance. (*Id.*; *see also id.* at 43, 362, 467.) The Court recognizes that the "ALJ may not draw any inferences about a claimant's condition from [his failure or infrequency of treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Beardsley*, 758 F.3d at 840 (citing *Craft*, 539 F.3d at 679; SSR 96-7p). Here, there is no evidence in the record that the ALJ conducted such an exploration. Mr. Barner's renewed insurance and lack of additional care, however, suggest at the very least that Mr. Barner was not financially precluded from obtaining care. To the extent that the ALJ inferred anything beyond this, the Court considers it harmless error given the alternative reasons the ALJ relied upon as described above. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("The doctrine of harmless error indeed is applicable to judicial review of administrative decisions."). Thus, the ALJ appropriately gave "some weight" to Mr. Barner's nongovernmental disability benefits—he simply found that inconsistent evidence in the record undercut its importance. *See Allord*, 455 F.3d at 820.

Mr. Barner's assertion that it was the ALJ's responsibility to inquire further about Mr. Barner's nongovernmental benefits conflicts with this Circuit's burden framework. Indeed as the government noted in its response, Mr. Barner had the burden to explain to the ALJ why he was disabled by his impairments. (R. 16 at 4 (citing *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013).) Here, Mr. Barner simply testified that he received external benefits but failed to explain

their relevance or supplement the record with any further evidence.  (*Id*. at 40-41, 43.)  After giving Mr. Barner's external benefits "some weight," the ALJ found that "substantial evidence" in the record undercut any inferences stemming from them, supporting his denial.  *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014).  As a result, the ALJ correctly considered Mr. Barner's external benefits and, ultimately, had adequate support to conclude that they were not determinative.

## II.    Mental Impairments

Next, Mr. Barner asserts that the ALJ failed at step 3 to adequately consider Mr. Barner's alleged mental impairments and the record evidence supporting them.  The Court disagrees.

"To determine whether an individual is disabled at step 3, an ALJ must follow 20 C.F.R. §404.1529(d)(3), which describes how the agency decides whether the individual's impairment or combination of impairments are medically equal in severity to an impairment on the list of pre-determined disabling impairments."  *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015).  When making this determination, "[a]dministrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 C.F.R. §404.1527(e)(2)(i).  Importantly, under 20 C.F.R. 404.1508, "[a] physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms."[1] Indeed, the regulations prohibit the ALJ from "substitut[ing] [the claimant's] allegations of pain or other symptoms for a missing or deficient sign or laboratory finding [i.e., objective medical

[1] Signs are "anatomical, physiological, or psychological abnormalities which can be observed, apart from [the claimant's] statements."  20 C.F.R. §404.1528(b).  Symptoms are the claimant's "own description of [his] physical or mental impairment.  [The claimant's] statements alone are not enough to establish that there is a physical or mental impairment."  20 C.F.R. §404.1528(a).  Laboratory findings are "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques."  20. C.F.R. §404.1528(c).

evidence] to raise the severity of [the claimant's] impairment(s) to that of a listed impairment." *Curvin*, 778 F.3d at 650 (citing 20 C.F.R. §404.1529(d)(3)); *see also Orienti v. Astrue*, 958 F. Supp. 2d 961, 973 (N.D. Ill. 2013) ("Like her testimony at her hearing, the record contains only [claimant's] descriptions of her symptoms. Such evidence is not enough to establish a mental impairment.") (citing 20 C.F.R. §404.1508). Put differently, "[t]he regulation provides that an ALJ will not consider the individual's own allegations if the medical evidence demonstrates a lack of severity. It is a straight prohibition against substituting an individual's symptoms for objective medical evidence." *Id*. In addition, impairments must meet the "duration requirement" to qualify for DIB. *See* 20 C.F.R. §404.1509. Specifically, the impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." *Id*.

Here, the ALJ concluded that "the claimant's alleged post-traumatic stress disorder and/or other mental allegations, are not medically determinable." (R. 8, Admin. Record, at 15.) Significantly, the ALJ found that the "one-time diagnosis by a consultative examiner . . . was based wholly on the claimant's subjective reports, as noted by the assessing physician[.]" (*Id*.) Indeed, Dr. Karr reported that Mr. Barner's mood and affect were congruent without overt indication of dysphoria or anxiety. (*Id*. at 15, 425.) Mr. Barner was alert but not vigilant with no apparent cognitive difficulty, and there was no indication of gross psychopathology. (*Id*.) In sum, Dr. Karr concluded that Mr. Barner presented unremarkably. (*Id*. at 15, 427.) At the end of his report, however, Dr. Karr noted that Mr. Barner, in contrast to Dr. Karr's conclusion, alleged residual emotional effects in connection with trauma. (*Id*.) Based only on Mr. Barner's subjective allegations, Mr. Barner's post-traumatic stress disorder diagnosis lacked the requisite signs and laboratory findings under 20 C.F.R. 404.1508, thereby failing to qualify as a severe impairment. Further, the ALJ noted that Mr. Barner's alleged post-traumatic stress disorder

failed the durational requirement under 20 C.F.R. §404.1509. At the time of Dr. Karr's examination on April 5, 2012, only five months had passed since the November 2011 shooting. (*Id*. at 424.) Thus, the ALJ properly ascribed little weight to Dr. Karr's post-traumatic stress disorder diagnosis.

In addition, the record supports the ALJ's decision to give "little weight to the State agency psychological consultants [sic] opinions[.]" (*Id*. at 15.) Specifically, the ALJ weighed lightly Dr. Jablonska's "depressive disorder, not elsewhere classified" diagnosis (*Id*. at 331.) and the "Disability Determination Explanations" (*Id*. at 79, 91.) that relied on Dr. Jablonska's diagnosis. First, the ALJ highlighted that these opinions—similar to Dr. Karr's post-traumatic stress disorder diagnosis described above—hinged purely on Mr. Barner's subjective allegations. (*Id*. at 15.) Dr. Jablonska consistently reported Mr. Barner as having good judgment, exhibiting normal mood and affect, being active and alert, and orienting appropriately to time, place, and person. (*Id*. at 332, 335, 477, 481, 484.) Indeed, the closest Dr. Jablonska's examinations came to identifying a depressive disorder was identifying that Mr. Barner exhibited "poor insight." (*Id*. at 481.) Mr. Barner, however, reported that he had difficulty sleeping, headaches, and depression, and Dr. Jablonska reported that Mr. Barner had a "depressive disorder, not elsewhere classified." (*Id*. at 331.) Mr. Barner's psychiatric self-descriptions, however, were as uncorroborated as his post-traumatic stress disorder allegations, and they share the same fate. Further, Drs. Gilliland and Hudspeth, Mr. Barner's state agency psychological consultants, explicitly reported that the medical evidence may support "mild" mental functional limitations but did not indicate any "severe" mental conditions. (*Id*. at 84, 98.) Consequently, the ALJ appropriately afforded these uncorroborated and inconsistent opinions little weight.

Ultimately, the ALJ properly recognized that, although Mr. Barner presented symptoms exhibiting mental impairments, the record was devoid of objective signs and laboratory findings required under the regulations.  The ALJ thus offered "reasons grounded in the evidence" to support his finding that Mr. Barner did not suffer from severe mental impairments that qualified as disabilities under the relevant regulations.  *See Green v. Colvin*, 605 Fed. App'x. 553, 558 (7th Cir. 2015) (citing *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012)).  The record supports his finding.

## III.    Treating Physician's Opinion

Mr. Barner also contends that the ALJ at step four improperly ignored a treating physician's opinion leading to an inaccurate residual functional capacity determination.  The Court disagrees.

"[T]he ALJ need not blindly accept a treating physician's opinion—[he] may discount it if it is internally inconsistent or contradicted by other substantial medical evidence in the record."  *Henke v. Astrue*, 498 Fed. App'x. 636, 639 (7th Cir. 2012) (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)); *see also Stepp v. Colvin*, 795 F.3d 711, 719 (7th Cir. 2015) (finding that a treating physician's conclusion warranted "little weight," as it was inconsistent with both that physician's past notes and the record as a whole) (citing 20 C.F.R. §404.1527(d)(2)[2])).  "An ALJ 'must offer good reasons for discounting a treating physician's opinion.' "  *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing *Larson*, 615 F.3d at 749; 20 C.F.R. §404.1527(d)(2)).  Indeed, "the ALJ's decision must stand as long as [he] has 'minimally articulated' [his] reasons for rejecting the treating doctor's opinion."  *Henke*, 498 Fed. App'x. at 639 (citing *Elder*, 529 F.3d at 415 (referring to the "minimally articulated"

---

[2] Where the numbering of the regulation has changed, the Court cites to the version in effect at the time.

requirement as "a very deferential standard that we have, in fact, deemed 'lax.' ") (citation omitted)).  Additionally, when the ALJ does not give the treating physician's opinion controlling weight, the ALJ must still determine what weight the opinion does deserve.  *See Campbell*, 627 F.3d at 308 (citing *Larson*, 615 F.3d at 751).  To do so, the ALJ must apply various factors, including, in part 1) the length of the treatment relationship and the frequency of the examination; 2) the nature and extent of the treatment relationship; 3) the supportability of the opinion; and 4) the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. §§404.1527(c)(2)(i)-(ii), (3)-(6); *see also Campbell*, 627 F.3d at 308.

Here, Dr. Makhlouf issued a one-line opinion stating that "Mr. Barner has been released to perform sedentary work only effective May 21, 2012."  (R. 8, Admin. Record, at 496.)  The ALJ declined to assign controlling weight to this opinion.  (*Id*. at 21.)  Instead, the ALJ found the opinion was "worth little weight," because it was inconsistent with and unsupported by the record.  (*Id*. at 21.)  First, the ALJ found that Mr. Barner, through his counsel, stipulated that his appropriate residual functional capacity was a "light exertion level" with postural restrictions for his left upper extremity, as opposed to "sedentary work levels."  (*Id*. at 21, 34.)  Second, the ALJ highlighted that Mr. Barner testified that he was able to lift up to twenty pounds.  (*Id*. at 21, 34, 54-57.)[3]  Third, the ALJ reviewed Mr. Barner's treatment history with Dr. Makhlouf and found it internally inconsistent with the note at issue, as the doctor reported that Mr. Barner had "excellent" range of movement in all of his fingers and did not report any gait or musculoskeletal abnormalities after his final surgery on February 2012.  (*Id*. at 18, 306.)  Moreover, the ALJ explained that Dr. Makhlouf informed Mr. Barner's occupational therapists that Mr. Barner had

---

[3] Title II of the Social Security Act defines "sedentary work," in part, as "involving lifting no more than 10 pounds at a time[.]"  SSR 83-10 (S.S.A. 1983).  The regulations define "light work," however, as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  *Id*.

"no restrictions." The parties differ as to whether Dr. Makhlouf's note referred to Mr. Barner's upper left extremity's overall capabilities or simply its physical therapy capabilities. (R. 9 at 11; R. 16 at 9.) Regardless, however, it is reasonable to read Dr. Makhlouf's "no restrictions" note as a testament to the progress Mr. Barner's upper left extremity demonstrated over time and, when read with the record as a whole, in conflict with with Dr. Makhlouf's May restrictive note at issue. Fourth, the ALJ gave great weight to Mr. Barner's August 22, 2012 physical consultative examination report, describing it as the "most detailed description of the most thorough assessment of the claimant's left upper extremity in the record." (*Id*. at 19.) Specifically, this examination reported that Mr. Barner's gait was normal; he had no swelling, tenderness, deformity, or hypernia of any joint; he showed no paravertebral tenderness; his range of movement was within normal limits despite some slight flexion limitations; his strength was five out of five in all extremities except the left upper extremity that was only slightly diminished, ranking four out of five; he exhibited no limitations when picking small objects up; and he only displayed mild limitations in his left upper extremity when performing ministerial tasks. (*Id*. at 19, 21, 463-66.)[4] Finally, the ALJ focused on the supportability factor and found that the "opinion was very conclusory providing no clinical support or findings to support the limitations." (*Id*. at 21.) As a result, the ALJ appropriately relied on the regulation's relevant factors and concluded that Dr. Makhlouf's May 2012 note limiting Mr. Barner to "sedentary work" levels was inconsistent with and unsupported by record evidence dating both before and after the note's issuance. Therefore, the ALJ, guided by the appropriate regulatory factors,

---

[4] Although the ALJ described them in more detail earlier in his decision, the Court still considers these third and fourth reasons as relevant to why the ALJ chose not to assign controlling weight to Dr. Makhlouf's statement at issue. *See Curvin*, 778 F.3d at 650 ("We do not discount [the ALJ's discussion] just because it appears elsewhere in the decision. To require the ALJ to repeat such a discussion throughout his decision would be redundant.") (citing *Rice v. Barnhart*, 384 F.3d 636, 370 n. 5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole, and . . . it would be a needless formality to have the ALJ repeat substantially similar factual analyses[.]")).

"minimally articulated" "good reasons" as to why he granted Dr. Makhlouf's opinion little, rather than controlling, weight in his analysis. *Campbell*, 627 F.3d at 306; *see also Elder*, 529 F.3d at 415; 20 C.F.R. §§404.1527(c)(2)(i)-(ii), (3)-(6).

## IV.    Vocational Expert Testimony

Last, Mr. Barner asserts a number of arguments aimed at discrediting the ALJ's step four analysis as it related to Mr. Malik, the vocational expert's testimony at the July 25, 2013 hearing: 1) the ALJ unreasonably extended Mr. Malik's testimony beyond its meaning; 2) the ALJ's hypothetical question for Mr. Malik did not match the ALJ's eventual residual functional capacity determination; and 3) the ALJ inaptly omitted Mr. Barner's narcotic pain medicine limitation from both his hypothetical question and residual functional capacity finding. The Court addresses each in turn.

### A.    Past Employment

First, Mr. Barner argues that the ALJ erred in concluding that Mr. Malik's testimony supported a finding that Mr. Barner could perform both the security guard job and security manager job Mr. Barner previously held. Instead, Mr. Barner contends that Mr. Malik's testimony only supported a finding that Mr. Barner could perform the security guard job. The Court finds this argument irrelevant at best, and incorrect, at worst. Upon hearing the ALJ's hypothetical question describing Mr. Barner's characteristics, Mr. Malik testified that the individual would be able to do "the security guard" job Mr. Barner held in the past according to the DOT. Even if this were Mr. Malik's only testimony, it would still support an overall finding that Mr. Barner was not disabled, as he would be able to perform at least one of his past jobs. *See* 20 C.F.R. §404.1560(b)(3). Mr. Malik, however, also testified that the security guard and security supervisor positions both required "light physical demand" per the DOT. (R. 8, Admin.

Record, at 68.)  Reading the record as a whole, the ALJ properly concluded that Mr Malik's

testimony that Mr. Barner could perform one of these past jobs supported a finding that Mr.

Barner could perform both of them, as they required the same exertion level.  *See Dornseif*, 2012

WL 1441770, at *10 (stating that the "ALJ must 'consider all of the evidence in the case record'")

(quoting *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007)).

### B.    Unequal Hypothetical and Residual Functional Capacity Finding

Second, Mr. Barner maintains that the ALJ's hypothetical question and residual

functional capacity finding differed with respect to relevant characteristics and limitations.  To

the extent that there were differences, however, they were harmless.  *See Spiva*, 628 F.3d at 353

("If it is predictable with great confidence that the agency will reinstate its decision on remand

because the decision is overwhelmingly supported by the record though the agency's original

opinion failed to marshal that support, then remanding is a waste of time.").  Mr. Barner

contends that the ALJ included the maximum length of time an individual could stand at one

time in his hypothetical question he posed to Mr. Malik but did not clarify such a limitation in

his residual functional capacity finding, allegedly creating an ambiguity that requires remand.

The ALJ, however, made it clear during the July 2012 hearing that he believed that sixty minutes

was the only relevant maximum standing time period with regard to Mr. Barner's case.  (R. 8,

Admin. Record, at 69-75.)  Indeed, the ALJ at one point corrected Mr. Malik's misimpression

regarding this maximum standing time and asserted for a second time that sixty minutes was the

relevant amount—leaving no room for ambiguity.  (*Id.*)  Mr. Barner also argues that the ALJ

similarly left out of his residual functional capacity finding that Mr. Barner did not need to

abandon his work upon alternating physical positions at the end of sixty minutes, despite

including it in his hypothetical question to Mr. Malik.  This argument meets the same fate: the

ALJ was clear in his Barner-hypothetical that Mr. Barner was able to alternate positions without abandoning his work. Importantly, the ALJ explicitly stated that his step four analysis depended, in part, on the hypothetical inquiries he posed to Mr. Malik. (*Id*. at 22.) As a result, the ALJ relied on the clear, unequivocal determinations he included in his hypothetical to arrive at his eventual residual functional capacity determination despite not fully articulating the limitations in the written result. The Court considers this a harmless error that would not change the outcome upon remand. *See Spiva*, 628 F.3d at 353.

Citing *Kasarsky v. Barnhart*, Mr. Barner contends that the ALJ's inharmonious hypothetical question and residual functional capacity determination failed to follow Seventh Circuit requirements. 335 F.3d 539, 543-44 (7th Cir. 2003). Mr. Barner, however, misapplies *Kasarsky*. The Seventh Circuit made clear that "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers. Otherwise, the vocational testimony will not reveal whether there are jobs in the national economy that a person like the claimant could perform, and if so, how many." *Id*. at 543 (citation omitted). Here, Mr. Barner admits that the ALJ indeed included the relevant limitations, including the maximum standing time and lack of work-abandonment, in his hypothetical question to the vocational expert. Instead, Mr. Barner focuses on the fact that the ALJ did not include them in his residual functional capacity finding—which, as described above in more detail, simply amounts to harmless error. Thus, the ALJ followed *Kararsky*'s requirement, and the vocational testimony was successfully tailored toward Mr. Barner's specific limitations, bolstering its credibility in the ALJ's calculus.

### C. Omitted Narcotic Pain Medicine Limitation

Finally, Mr. Barner argues that the ALJ erroneously omitted any limitations related to Mr. Barner's narcotic pain medication use in his hypothetical question and step four analysis. "[T]he ALJ," however, "is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt*, 496 F.3d at 845-46 (citing *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). At the July 2012 hearing, the ALJ explicitly admonished Mr. Barner that any testimony regarding Mr. Barner's narcotic pain medication would likely not be "a relevant concern for my analysis." (R. 8, Admin. Record, at 74.) Moreover, Mr. Malik only answered questions regarding Mr. Barner's narcotic pain medication's relevance to Mr. Barner's employment capabilities after admitting that he had not done a labor market survey to that effect to give an accurate response. (*Id.*) Accordingly, both the ALJ's and Mr. Malik's explicit warnings and the ALJ's lack of narcotic limitations imply that the ALJ did not accept as credible that Mr. Barner would need narcotic pain medication to engage in a significantly reduced range of light physical demand work or that the medication would significantly impair him from doing so if he did. *See Schmidt*, 496 F.3d at 845-46.

## CONCLUSION

For the foregoing reasons, the Court denies the plaintiff's motion for summary judgment.


**DATED:  October 27, 2015**                          **ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge